# CASES

## DECIDED IN THE

## COURT OF CHANCERY OF NEW-JERSEY,

## JULY TERM, 1832.

---

GARRET S. HENDRICKSON, WILLIAM G. HENDRICKSON, PE-
TER S. HENDRICKSON, LAWRENCE THOMAS, WILLIAM
HENDRICKSON and ALICE his wife, and SAMUEL POTTER
and REBECCA his wife, v. JAMES IVINS.

Upon an agreement for the sale of land, of which a memorandum in writing
was made as follows:—"January, 17, 1829. This may certify that James
Ivins has agreed with the heirs of Samuel Hendrickson, deceased, for the
farm where Garret Hendrickson now lives, and the said James Ivins is to
give them forty-eight dollars per acre for the same." Although not noticed
in the agreement, it may be shown by parol evidence, that it was mention-
ed at the time of the agreement, and admitted by the vendee in an after-
conversation, that the green grain then growing in the ground, and some
wild cherry logs, were reserved in the sale; and this part of the agreement
is not within the statute of frauds, and will be enforced in equity.

And where the agreement existed, without any alteration in this respect, up to
the time of executing the deed; and the scrivener who prepared the deed,
being requested by one of the vendors to insert the reservation in it, declin-
ed doing so; not because it was objected to on the part of the vendee, but
because he considered it unusual, if not improper, to insert such reservation
in a deed in fee simple; and the deed was executed without it. Whe-
ther it be considered a mistake in the scrivener in not inserting it, or inad-
vertence in the vendors in not insisting upon its insertion, is immaterial;
the mistake in the deed will be rectified, so as to accord with the agreement
of the parties.

The idea which formerly prevailed, that *mistakes* could not be relieved against,

though cases of *fraud* might, has long been considered unsound; and certainly is not, at this day, the law of this court.

So, too, the principle which formerly obtained, that although a *defendant* might avail himself of a plain mistake, and thereby relieve himself from the operation of a written agreement; yet the *complainant* was not entitled to the same assistance to enable him to recover, has been repeatedly overruled; and the late cases go far to place both parties on the same footing.

Courts of equity now go on the broad principle, that where a mistake is manifest, they will, in the exercise of their ordinary jurisdiction, correct it, and hold the party according to his original intention.

Whether there is a custom of the country, that when a party is entitled to the way-going crop he can take the grain only, and not the straw, or if he take the straw away he must return it; established in such a way as to justify this court in acting on it, where there is no written contract, *query*.

But in the case of vendor and purchaser, the contract itself must govern; and must be construed according to its own terms, and not according to the customs or usages between landlord and tenant, in respect to the way-going crop.

Under a reservation, in a contract for the sale of lands, of green grain in the ground, the whole crop goes together and is reserved; under the term *green grain in the ground*, it is, *quoad hoc*, an entirety, and cannot be separated into its component parts; and being reserved, it is as though the vendee had purchased the land without any such grain being in the ground, and he has no interest in it whatever.

Under such circumstances, the vendee was properly enjoined from prosecuting a suit against the vendors, for taking the grain and straw; and the injunction was continued.

The principal ground of defence, i. e. the construction of the contract, not being unconsciencious, no costs were given.

July, 1832.

Hendrickson
et al.
v.
Ivins.

THE original bill in this cause was for an injunction, and presents the following case :—

That in 1815, Samuel Hendrickson, of Monmouth county, died intestate, leaving children, viz.: Peter, Samuel, Tobias, Garret, Rebecca afterwards wife of Samuel Potter, and Alice afterwards wife of William Hendrickson. Peter sold out his interest in the real estate descended to them, to the other heirs. In 1829, Garret, Rebecca, and Alice, occupied the premises, paying the other heirs rent therefor according to their respective interests therein. In the autumn of 1828, Garret and Alice caused a crop of rye to be put in on thirty-five acres of the premises, which they insist they were authorized to cut and appropriate to their own use when at maturity. In January, 1829,

the said heirs agreed with James Ivins, the defendant, to sell him the said real estate for forty-eight dollars per acre ; and on the 17th January, 1829, a short and imperfect memorandum of the agreement was made, which was afterwards departed from, and a new verbal agreement for said sale was made between the parties, in which it was expressly stipulated, that the grain growing on the premises should be reserved, and certain wild cherry trees were also expressly reserved.

On the 4th of April, 1829, a deed was executed, conveying to Ivins the property, in which deed no mention was made of the grain being reserved. This was through mistake and inadvertence, and because it was not customary, in conveyances in fee simple, to make mention of such circumstances.

In July, 1829, Garret Hendrickson caused the said rye to be cut and carried away, for the use of himself and sisters, being the lessees as aforesaid ; and that William Hendrickson, Peter Hendrickson, and one Lawrence Thomas assisted, acting under him. Upon this Ivins brought suit against Garret, William and Peter Hendrickson, and Lawrence Thomas, in the common pleas of Monmouth ; and this bill was filed for an injunction and relief. It prays that the grain may be decreed to belong to the said Garret, and to Alice and Rebecca and their husbands, and that the mistake in the deed may be rectified so as to exclude the grain from its operation. On filing this bill an injunction was issued, staying further proceedings at law.

The defendant, in his answer, admits that Samuel Hendrickson died seized, and left children, as above stated : that in 1829, the premises were occupied by Garret, Rebecca and Alice, as above set forth ; but cannot state the terms of such occupancy. He admits, that in the autumn of 1828, they caused a crop of rye to be sown on the premises, on about forty-one acres of it, and not thirty-five, as stated by the complainants. That on the 17th of January, 1829, defendant entered into an agreement with the heirs for the purchase of the farm, at forty-eight dollars per acre ; and that a memorandum of said agreement was made and signed by defendant and the heirs, in the following form : " January 17th, 1829. This may certify, that James Ivins has agreed with the heirs of Samuel Hendrickson, deceased, for their farm

where Garret Hendrickson now lives; and the said James Ivins is to give them forty-eight dollars per acre for the farm." He denies that the agreement contained any reservation of the grain, or that the said agreement was ever departed from, or any verbal reservation made respecting the grain. He alleges, that a few days after the agreement was made, Garret, Rebecca, and Alice and her husband, called on defendant, and said they had concluded not to sell the farm ; but that neither Samuel nor Tobias made any effort to rescind the contract. A few days after, the objections were withdrawn. That after the said agreement was fully made, Samuel said there were a few wild cherry tree logs lying on the premises that they wanted for furniture, and there was also the rye growing on the ground. That thereupon the defendant declared, that if they would let him into possession of the premises peaceably and without diminution, he would not object to their taking the logs and the grain, leaving the straw. He has no recollection of any other agreement or reservation. The defendant admits the execution of the deed, and insists that at the time of the delivery, (in April,) there was no reservation or exception whatever, and that the whole of the property, with the rents and profits thereof, belong to the defendant. He denies any other reservation than that above stated, which he says was a mere benevolence, and without consideration, and formed no part of the contract ; and denies that they let him into possession peaceably and without diminution, but that they took off the premises several loads of ashes, cut down four large wild cherry trees useful for shade, carried off a white oak log, and claimed and attempted to remove several other articles. He was still willing they should take the rye, provided they would thresh it on the premises and leave the straw, according to the license he had formerly given conditionally for the purpose ; but they refused to act under such license, and set up a claim of right not only to the grain, but the straw. The defendant then sets up the statute for the prevention of frauds and perjuries, in bar of any parol agreement respecting the premises; and admits that when the complainants had entered and carried away the grain and straw, after being warned not to do so, he brought suit against them in the common pleas of Monmouth, as lawfully he might.

*G. Wood,* for complainants;

*G. D. Wall,* for defendant.

THE CHANCELLOR. Much testimony has been taken on both sides; and I think, on a careful review of it, there can be no doubt that, by the original agreement, entered into on the 17th January, 1829, the green grain then growing in the ground was reserved out of the purchase; and that, in what is called the second bargain, which was subsequently made, after certain difficulties on the part of some of the heirs had been removed, the same reservation was continued and confirmed.

Samuel S. Hendrickson testifies, that he was present when the agreement for sale took place; and that he informed defendant then that the grain belonged to Garret and his sisters, and must be reserved; and that the defendant agreed to it. There was nothing said about straw, but he considered the grain in the ground as embracing the grain and the straw, or considered them as one thing. After this some of the heirs became dissatisfied, and attempted to rescind the contract. Finally they all agreed to the sale, and witness again mentioned to defendant that the grain must be reserved, to which the defendant agreed.

Tobias S. Hendrickson was also present, and says the green grain in the ground was reserved. Samuel mentioned it, and the defendant consented to it; he said, "of course, he did not expect to have that."

These two witnesses swear expressly as to the fact and time of the transaction; and their testimony, from the circumstance of their being interested in the sale, and having their attention drawn to what took place at the time, and yet in no way interested in this question, is entitled to great consideration.

In addition to this, Gilbert Hendrickson testifies, that after the defendant went into possession of the property, he asked of him permission to get some black oak logs off the premises, which he had purchased of the former owners; he refused permission, and said they were not reserved, that only the grain in the ground and the cherry tree logs were reserved. He states further, that when the grain was being cut, defendant came to him

to know his opinion, whether he (the defendant) was entitled to the straw. He claimed it then as a custom, but said nothing about any agreement relating to it. This is in all things confirmed by the evidence of Ida Ann Molatt, who was present when the conversation took place.

There are some of the defendant's witnesses who speak of a conversation between the defendant and Garret or William in relation to the grain, and who understood the parties to say there was no other agreement but the short memorandum in writing, which was placed in the hands of John Taylor, jun. for safe keeping. Others understood them to refer to some subsequent agreement for taking the grain and some cherry tree logs, not in the nature of a reservation, but rather of a conditional permission, given *ex gratia*, and not founded on any consideration. But, notwithstanding these apparent discrepancies, I am satisfied that the conclusion to which I have arrived is correct. Casual conversations are but little to be relied on, especially when detailed after a lapse of time, by persons who had no particular interest in them when they occurred, and no special motive for treasuring them up in the memory. Some of the defendant's evidence on this point of the case is of this character; and making for it the allowance that is always due to such testimony, it is not difficult to reconcile it with the truth of the case.

But the agreement was entered into in January, and the deed, which is alleged to be contrary to the agreement and to have been drawn so by mistake or inadvertence, was executed in April. An important question is, did the agreement continue until the time the deed was executed, or was it altered? It must appear that the agreement was in existence, unrevoked, at the time of making the deed, or the fact of the mistake is not made out. It is not expressly shown from the evidence, that there was, when the deed was executed, any express recognition of the previous agreement. The conversation that passed between Hendrickson and Debow the scrivener, respecting the insertion of the reservation in the deed, was not in the presence of Ivins, and is no evidence against him. I think, however, the whole evidence shows there had not been, up to the time the deed was executed, any alteration of the original agreement, and that none was then

made. As it was before, so it existed at that time; and the deed as drawn, with full covenants and without any reservation, was not in conformity with the understanding of the parties.

The deed was prepared by Debow. He was requested by one of the vendors to insert the reservation in it. He declined doing it, not because it was objected to on the part of the defendant, but because he considered it unusual, if not improper. These reservations, he said, were never made in fee simple conveyances. This satisfactorily explains why the reservation was not made in the deed; and whether it is considered a mistake on the part of the scrivener in not inserting it, or an inadvertence on the part of the vendors in not insisting on its being done, is not at all material.

The agreement, then, being established, and it being also made manifest that the deed was drawn in its present form through mistake or inadvertence, and that it is not in accordance with the agreement of the parties, the question arises, whether this court can or will correct the mistake? and upon this point I cannot entertain a doubt. The idea which formerly prevailed, that *mistakes* could not be relieved against, though cases of *fraud* might, has long been considered unsound, and certainly is not at this day the law of this court. So, too, the principle which formerly obtained, that although a defendant might avail himself of a plain mistake, and thereby be relieved from the operation of a written agreement, yet the complainant was not entitled to the same assistance to enable him to recover, has been repeatedly overruled; and the late cases go far to place both parties on the same footing. Courts of equity go now on the broad principle, that where a mistake is manifest, they will, in the exercise of their ordinary jurisdiction, correct it, and hold the party according to his original intention. And upon this principle, I have no difficulty in ordering the mistake in this case to be rectified.

I will only refer to a few of the leading English cases on this subject: *Wordale* v. *Halfpenny*, 2 *P. Wms. R.* 151; *Heneage* v. *Hunloke*, 2 *Atk. R.* 456; *Simpson* v. *Vaughan*, 2 *Atk. R.* 31; *Henkle* v. *Royal Exchange Assurance Co.* 1 *Ves. sen.* 317; *Baker* v. *Paine*, 1 *Ves. jr.* 456; *Burn* v. *Burn*, 3 *Ves.*

*jr.* 573.   In this last case, a joint bond was held by lord Rosslyn to be a several bond, even against creditors ; and the mistake was shown on the part of the complainant.   So also, in the case of the *South Sea Co.* v. *D'Oliffe*, cited 5 *Ves. jr.* 601, the party was relieved against a mistake in a bond given by way of security, six months having been inserted instead of two months.   Many other cases might be named.   See those collected in 2 *Bridg. Index, tit. Mistake ; Sug. on Vendors,* 120 ; and *Jeremy on Eq. Jurisd.* 432, 456, 489, 490.

Chancellor Kent, in *Wiser* v. *Blackly*, 1 *John. C. R.* 601, recognizes the same principle ; and also in *Gillespie* v. *Moor*, 2 *John. C. R.* 585.

The question has several times been raised in this court, and I believe the decisions have always been uniform.   In the case of *Smith* v. *Allen and al.*, decided in the term of July, 1830, the court rectified a mistake in a bond taken by a sheriff for the prison limits, under the statute ; and that, too, on the application of the complainant.   In that case all the authorities are collected. I have examined the opinion then pronounced, in reference to this subject, and am satisfied of its correctness.

Taking the law to be settled on this point, I shall consider the deed reformed, and proceed to inquire into the construction to be given it.   Shall it be construed as giving to the party reserving the green grain in the ground, the right to carry off the premises the straw, when the crop shall have arrived at maturity, or must the straw be left on the ground ?

Much evidence has been adduced to prove what is the custom of the country in relation to the way-going crops.   It has been sought to establish the principle, that when a party is entitled to a way-going crop, he can take the grain only, and not the straw ; or if he take the straw away he must return it.   I doubt whether any custom has been established in such a way as to justify the court in acting on it.   Most of the cases referred to by the witnesses, were cases of holding under written contracts, in which it was stipulated that no hay or straw should be removed from the premises ; and only prove that the generality of specific agreements are made in that way, but do not determine what the custom is when there is *no* contract.   Some of the cases are

April, 1832.

Hendrickson
et al.
v.
Ivins.

directly in point, and are entitled to a respectful consideration. It does not appear to me, however, if the custom was fully proved, that it would govern this case. There is no relationship of landlord and tenant existing between these parties. As between them, the crop cannot be viewed in the light of a way-going crop. As between the heirs themselves, some of whom were lessors and others lessees of this property, the custom, if proved, might apply.

In this case, the contract itself must govern; and it is to be construed according to its own terms, and not according to the customs or usages which may exist between landlords and tenants. It appears to me the contract admits of but one construction; and that is, that the whole of the crop, grain and straw, goes together, under the term *green grain in the ground.* It is, *quoad hoc,* an entirety, and cannot be separated into its component parts. The green grain in the ground being reserved, it is as though the defendant had purchased the property without any such green grain being in the ground. It must be separated from the purchase, and taken as though it had no existence. It has none as to the purchaser, for he has no interest in it whatever.

I consider, therefore, that under the contract itself, the vendors were entitled to the crop in its largest sense; that they were justified in taking it as they did; and that the defendant be perpetually injoined from further prosecuting his suit in the common pleas.

I doubt the propriety of costs in this case, more especially as the defence on the principal ground, the construction of the contract or reservation, does not appear unconsciencious. If costs are claimed by the complainant, I will hear him in behalf of the application.